SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: November 5, 2018

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **JUDY THOMPSON AND MARION THOMPSON,** | **CASE NO. 12-03668-NPO** |
| **DEBTORS.** | **CHAPTER 13** |
| **JUDY THOMPSON AND MARION THOMPSON** | **PLAINTIFFS** |
| **VS.** | **ADV. PROC. NO. 17-00058-NPO** |
| **SETERUS, INC.** | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO DISMISS AND
## <u>DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

There came on for consideration the Motion to Dismiss (the "Motion to Dismiss") (Adv. Dkt. 35)[1] filed by Seterus, Inc. ("Seterus"); the Plaintiff's Response to Motion to Dismiss (the "Response in Opposition to Motion to Dismiss") (Adv. Dkt. 40); the Plaintiff's Motion for Summary Judgment (the "Summary Judgment Motion") (Adv. Dkt. 36) filed by the debtor, Marion

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-referenced adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. ____)"; and (2) citations to docket entries in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. ____)".

Thompson ("Joe Thompson");[2] the Plaintiff's Memorandum Brief in Support of Motion for Summary Judgment (the "Brief in Support of Summary Judgment Motion") (Adv. Dkt. 37) filed by Joe Thompson; the Response to Motion for Summary Judgment (the "Summary Judgment Response") (Adv. Dkt. 43) filed by Seterus; the Memorandum Brief in Support of Response to Motion for Summary Judgment (the "Brief in Opposition to Summary Judgment Motion") (Adv. Dkt. 44) filed by Seterus; the Plaintiff's Reply Brief in Support of Motion for Summary Judgment (the "Reply Brief") (Adv. Dkt. 45) filed by Joe Thompson; and the Defendant's Reply to Response to Motion to Dismiss (the "Reply to Response to Motion to Dismiss") (Adv. Dkt. 46) filed by Seterus in the Adversary.  Joe Thompson attached eleven exhibits to the Summary Judgment Motion (Adv. Dkt. 36-1 to 36-11),[3] and Seterus attached seven exhibits to the Summary Judgment Response (Adv. Dkt. 43-1 to 43-7).[4]

### Jurisdiction

The Court finds that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Notice of the Motion to Dismiss and the Summary Judgment Motion was proper under the circumstances.

### Facts[5]

On November 30, 2009, Judy Smith Thompson ("Judy Thompson") signed a promissory note in favor of Quicken Loans, Inc. in the amount of $94,200.00 (the "Note") (S. Ex. 3).  The

---

[2] *See* Dep. of Marion Thompson (Adv. Dkt. 43-5 at 5) ("Everybody calls me Joe.").

[3] Joe Thompson's exhibits will be referred to as "(J.T. Ex. __)".

[4] Seterus's exhibits will be referred to as "(S. Ex. __)".

[5] The following findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Note required Judy Thompson to make monthly principal and interest payments of $720.63. (S. Ex. 3 ¶ 3). To secure repayment of the Note, Judy Thompson and her then spouse, Joe Thompson (together with Judy Thompson, the "Thompsons"), signed a Deed of Trust (J.T. Ex. 1; S. Ex. 4) against residential property located at 1802 Irby Road, Morton Mississippi (the "Property"). In compliance with § 5 of the Deed of Trust, Judy Thompson insured the Property against loss by fire by obtaining an insurance policy from State Farm Fire and Casualty Co. ("State Farm") (S. Ex. 4 § 5).

**Commencement of Bankruptcy Case**

While still married, the Thompsons filed a joint voluntary petition for relief (Bankr. Dkt. 1) under chapter 13 of the Bankruptcy Code on November 19, 2012, and filed a Chapter 13 Plan (the "Plan") (Bankr. Dkt. 12) on December 3, 2012. They were delinquent in their payments on the Note when they commenced the Bankruptcy Case. In the Plan, the Thompsons proposed to pay monthly Plan payments of $1,425.67 for a term of sixty months. (Adv. Dkt. 37 at 3). They proposed to pay JPMorgan Chase Bank, National Association ("Chase")[6] the arrearage of $2,200.00 in installments of $36.67 per month and ongoing mortgage payments of $720.00 per month. They proposed to pay unsecured creditors in full. The Court entered the Order Confirming the Debtor's Plan, Awarding a Fee to the Debtor's Attorney and Related Orders (the "Confirmation Order") (Bankr. Dkt. 21) on February 4, 2013.

On March 21, 2013, Chase filed a proof of claim ("POC") (Claim #7) reflecting a total amount due of $81,734.68 and an arrearage of $1,563.35. On September 26, 2014, Seterus, acting as the loan servicer, filed the Transfer of Claim Other Than for Security (Bankr. Dkt. 29) to report that the claim had been transferred to Federal National Mortgage Association ("Fannie Mae"). On

---

[6] At some point, Chase acquired the Note from Quicken Loans, Inc.

September 3, 2015, Seterus filed the Notice of Change of Address for Creditor (Bankr. Dkt. 31), and on March 24, 2016, counsel for Seterus filed the Appearance of Counsel (Bankr. Dkt. 34; J.T. Ex. 3). These actions by Seterus demonstrate its knowledge of the existence of the Bankruptcy Case since at least September 26, 2014.

**Insurance Claim**

On June 27, 2015, a woodshop located on the Property was destroyed by an accidental fire. (Adv. Dkt. 1-1 at 2; Adv. Dkt. 43-5 at 32). Judy Thompson filed an insurance claim with State Farm. State Farm mailed Seterus two checks dated July 14, 2015, totaling $23,495.00 (the "Insurance Proceeds") made payable to both Judy Thompson and Seterus. (J.T. Ex. 4). With respect to property insurance and insurance proceeds, § 5 of the Deed of Trust provided, in pertinent part:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds . . . If the restoration or repair is not economically feasible or Lender's security interest would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to the Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

(S. Ex. 1 § 5). Section 2 provided, in pertinent part:

> 2.      Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts

shall be applied first to late charges, second to any other amounts due under this
Security Instrument, and then to reduce the principal balance of the Note.

\*   \*   \*

Any application of payments, insurance proceeds, or Miscellaneous
Proceeds to principal due under the Note shall not extend or postpone the due date,
or change the amount, of the Periodic Payments.

(S. Ex. 1 § 2).

Seterus forwarded the unsigned checks to Judy Thompson for her endorsement.  (S. Ex. 6 at 18).  Judy Thompson endorsed and returned the checks to Seterus on August 5, 2015.  (J.T. Ex. 5).  The checks were accompanied by a letter from Judy Thompson, explaining that she intended to replace the woodshop with a prefabricated metal building and "asking that your officers endorse the checks as per your request and return them to me as soon as possible so that we can purchase the new building and have it installed as soon as possible."  (*Id.*).  Seterus received the checks on August 11, 2015 and deposited the Insurance Proceeds into a restricted escrow account.  (Adv. Dkt. 43-6 at 44).  There is no evidence in the record that either the Thompsons or Seterus informed Harold J. Barkley, Jr., the duly-appointed chapter 13 trustee (the "Trustee"), about the Insurance Proceeds during this time.

Seterus sent a letter to Judy Thompson dated August 18, 2015, advising her that it "uses QBE Property Loss Department (QBE) to assist homeowners in the event of loss or damage to property securing the loans that we service."  (J.T. Ex. 6).  With respect to her request that Seterus release the Insurance Proceeds to her, Seterus informed her that "[b]ecause the total loss exceeds the limit we will pay directly to the homeowner, we have deposited the check into a holding account, so that repairs to the property can be monitored and inspected and funds disbursed accordingly."  (*Id.*).  Jessica Ludlow ("Ludlow"), the escrow administration manager for Seterus, testified by deposition that Fannie Mae's servicing guidelines for disbursing insurance proceeds

are based on the status of the loan. (S. Ex. 6 at 30-32). When asked to explain why Seterus refused to release the total Insurance Proceeds, she testified that pursuant to Fannie Mae's servicing guidelines, if a loan is 31 days or more delinquent and the insurance proceeds are greater than $2,500.00, Seterus may release an initial disbursement of only twenty-five percent (25%) of the total insurance proceeds up to $10,000.00 and may disburse the remaining insurance funds in increments that do not exceed twenty-five percent (25%) of the total insurance proceeds following inspection of the repairs. (S. Ex. 6 at 30).

Another letter from Seterus dated August 19, 2015, included a claim packet that explained the monitoring process and listed the contact information for the QBE Property Loss Department ("QBE"). In the letter, Seterus wrote "[u]pon QBE's receipt of the necessary documentation, as described in the packet, QBE will review the information. If everything required has been received, QBE will release the first disbursement to begin work on the property. QBE will require an inspection prior to the release of any additional funds. A final inspection will be required to ensure all repairs are complete." (J.T. Ex. 6).

After learning that she would have to comply with certain requirements to replace the woodshop, Judy Thompson sent a letter to QBE dated September 3, 2015, asking QBE and Seterus to apply the insurance proceeds to the unpaid loan balance.

> From our recent correspondence regarding the checks mailed to you for reimbursement from State Farm Insurance Company and the recent fire of a storage building on my property at the above mentioned address, I am writing to request that the funds from the checks you still have in your possession be used as payments to my mortgage. Your company has disallowed me to replace the building with a prefabricated building to the property, and we are unable to rebuild the building at this time. Please use those funds to apply to my mortgage balance, and in return please provide correspondence to me confirming this transaction was completed, with a total remaining balance on the mortgage as soon as possible.

(J.T. Ex. 7).  According to Ludlow, QBE notified Judy Thompson on September 23, 2015, that her request to forego replacing the woodshop was under review by Fannie Mae. (S. Ex. 6 at 23). Ludlow testified that on October 19, 2015, QBE requested, either by letter or by telephone, a copy of the insurance adjuster's report apparently for the purpose of determining the economic feasibility of replacing the woodshop.  (*Id.*).  After receiving no response from Judy Thompson, QBE obtained a copy of the adjuster's report directly from State Farm on December 1, 2015.  (S. Ex. 6 at 24-25).  That same day, Seterus submitted to Fannie Mae "Form 176," a form by which Seterus makes recommendations regarding the application of insurance proceeds.  On December 2, 2015, Fannie Mae denied Judy Thompson's request to apply the Insurance Proceeds to the unpaid balance of the loan based on the information provided by Seterus but agreed to allow her to replace the woodshop with a prefabricated structure. Fannie Mae instructed Seterus to work with Judy Thompson in repairing and replacing the woodshop.  (S. Ex. 6 at 25).  On December 8, 2015, QBE contacted Judy Thompson notifying her that Fannie Mae had denied her request to apply the Insurance Proceeds and requesting a copy of the floor plans for the prefabricated building.  QBE contacted Judy Thompson again in March, May, and July 2016 but never received the floor plans.  (S. Ex. 6 at 33).  Finally, on September 26, 2016, QBE advised Judy Thompson by telephone to send a letter requesting that Fannie Mae apply the Insurance Proceeds to the unpaid balance of the loan.  (S. Ex. 6 at 35).  After receiving no response, QBE sent Judy Thompson a letter in May 2017 reiterating its request that she confirm in writing her preference not to replace the woodshop.  On May 25, 2017, Seterus received a letter from Judy Thompson indicating that she did not intend to replace the woodshop, that the insurance claim matter was now the subject of bankruptcy litigation, and to contact her attorney going forward.  (S. Ex. 6 at 36).  Ludlow

viewed the May 25, 2017, letter as the written confirmation it first asked Judy Thompson to provide in August of 2016.  (*Id.*).

Seterus resubmitted "Form 176" to Fannie Mae notifying Fannie Mae of Judy Thompson's request that the funds be applied to the unpaid balance of the loan.  Fannie Mae responded on June 13, 2017, informing Seterus to maintain the Insurance Proceeds in the escrow account until Seterus obtained direction from the bankruptcy trustee and Judy Thompson's counsel.  (S. Ex. 6 at 37).  Fannie Mae otherwise had no objection to allowing Judy Thompson to apply the funds to the unpaid balance of the loan given her current circumstances.  On June 13, 2017, Seterus referred Fannie Mae's response to its bankruptcy department.

On July 11, 2017, bankruptcy counsel for Judy Thompson asked Seterus to apply the Insurance Proceeds to the unpaid balance of the loan.  Seterus complied but redeposited the Insurance Proceeds into the escrow account the next day, after being informed that Judy Thompson had changed her mind.  (*Id.*).  Then, on May 2, 2018, Seterus applied the Insurance Proceeds to the unpaid balance of the loan on May 2, 2018.  (S. Ex. 6 at 34).

**Dismissal & Reinstatement of Bankruptcy Case**

Meanwhile, the Trustee disbursed to Seterus, from August 28, 2015, through June 23, 2017, pre-petition arrearage payments of $570.01 and continuing monthly mortgage payments of $15,387.94, totaling $15,957.95.[7]  (J.T. Ex. 9).  On October 19, 2016, the Trustee filed the Notice and Motion to Dismiss (Bankr. Dkt. 35) the Bankruptcy Case on the ground that the Thompsons had become delinquent in their Plan payments with an amount due by November 9, 2016 of $5,703.50.  The Thompsons filed a response admitting that they were behind in their Plan payments and requesting sixty days to bring their payments current.  (Bankr. Dkt. 36).  On December 16,

---

[7] $15,957.95 = $570.01 + $15,387.94.

2016, the Court entered an Agreed Order (Bankr. Dkt. 40) providing for payment of the post-petition mortgage arrears through December 2016 over the remaining Plan period with regular maintenance payments to commence with the January 2017 payment. The Thompsons agreed that if they became sixty days or more delinquent in their Plan payments, calculated from January 1, 2017, then the Bankruptcy Case would be dismissed without further notice or hearing.

On December 20, 2016, the Thompsons filed the Motion to Modify Chapter 13 Plan (the "First Motion to Modify") (Bankr. Dkt. 44), notifying the Court and the Trustee for the first time of the existence of the Insurance Proceeds and requesting that no further amounts be paid to Seterus. Counsel for Seterus then informed counsel for the Thompsons that she was unable to locate the Insurance Proceeds. (S. Ex. 6 at 42-43). Based on this information, which counsel for the Thompsons construed as a representation by Seterus that the Insurance Proceeds were missing, the Thompsons agreed to an order (Bankr. Dkt. 57), entered by the Court on April 3, 2017, denying the First Motion to Modify. After the Thompsons again became sixty days delinquent in the Plan payments, the Bankruptcy Case was dismissed on June 19, 2017, pursuant to the Agreed Order (Bankr. Dkt. 40) entered on December 16, 2016. (Bankr. Dkt. 59). On July 14, 2017, the Thompsons filed the Motion to Reinstate Chapter 13 Case (Bankr. Dkt. 64), setting forth as grounds Seterus's willingness to apply the Insurance Proceeds to the unpaid balance of the loan. An Agreed Order (Bankr. Dkt. 70) submitted by the Thompsons and the Trustee was entered on August 9, 2017, reinstating the Bankruptcy Case.

The Thompsons filed a second Motion to Modify (Bankr. Dkt. 72), which was unopposed and which the Court granted on September 8, 2017. (Bankr. Dkt. 74). The Plan was modified to remove the provision that maintained the continuing mortgage payment and cured the pre-petition mortgage arrearage to Seterus and to cease disbursements both to Seterus and unsecured creditors.

**Divorce**

At some point in 2017, perhaps as early as January 2017, the Thompsons divorced, and Joe Thompson moved away.[8]  (S. Ex. 5 at 6, 13).  Joe Thompson did not receive any interest in the Property in the divorce proceedings.  (S. Ex. 5 at 6, 28).

**Adversary**

On October 10, 2017, the Thompsons filed the Complaint (the "Complaint") (Adv. Dkt. 1) initiating the Adversary against Seterus.  In the Complaint, the Thompsons alleged, in general, that Seterus failed to apply the Insurance Proceeds in September 2015 to cure the pre-petition delinquency and reduce the principal loan balance, which resulted in numerous unnecessary pleadings being filed and several unnecessary hearings being held in the Bankruptcy Case.  (*Id.* at 5).  If the Insurance Proceeds had been applied in September 2015, Plan payments could have been reduced by $812.00 per month, and each payment applied thereafter to the mortgage would have decreased the principal balance more.  (*Id.* at 5-6).

The Thompsons asserted seven counts for relief against Seterus.  In Count I, they alleged that Seterus breached the Deed of Trust by failing to apply the Insurance Proceeds to the unpaid loan balance pursuant to Judy Thompson's letter of September 3, 2015.  (*Id.* at 2-3).  In Count II, they alleged that Seterus willfully violated the automatic stay by exercising control over the Insurance Proceeds when it was aware of the pendency of the Bankruptcy Case.  (*Id.* at 3).  In Count III, they argued that Seterus should be held in contempt of the Confirmation Order for withholding the Insurance Proceeds from the estate based on its provisions that "[a]ll property shall remain property of the estate and shall vest in the debtor only upon dismissal, discharge, or

---

[8] The Thompsons did not ask the Court to de-consolidate their separate bankruptcy cases after their divorce.

conversion." (*Id.*).  In Count IV, they asserted that Seterus misapplied the Insurance Proceeds by failing to comply with § 2 of the Deed of Trust regarding the application of payments.  (*Id.* at 4). In Count V, they asserted that by failing to amend its POC and continuing to receive monthly disbursements from the Trustee after receipt of the Insurance Proceeds, Seterus was unjustly enriched by the misapplication of Plan payments.  (*Id.*).  In Count VI, they contended that Seterus violated Regulation Z, 12 C.F.R. § 1026.36(c), by failing to provide the Thompsons with periodic statements accounting for the Insurance Proceeds.  (*Id.*).  Finally, in Count VII, they sought damages against Seterus for the emotional distress caused to them because of its intentional and/or negligent act of withholding the Insurance Proceeds.  (*Id.* at 5).  In the Answer and Defenses (Adv. Dkt. 10), Seterus denied any liability.

**Bankruptcy Discharge**

On December 27, 2017, the Trustee issued the Trustee's Notice of Completion of Plan Payments in the Bankruptcy Case.  (Bankr. Dkt. 85).  On January 25, 2018, the Trustee issued the Notice of Final Cure Payment (Bankr. Dkt. 87) pursuant to Rule 3002.1(f) of the Federal Rules of Bankruptcy Procedure, indicating that the amount of the allowed pre-petition arrearage of $1,563.35 had been paid, the payments consisting of $1,325.75 from the Trustee and $237.60 from the Insurance Proceeds.  Seterus filed a response on February 15, 2018, informing the Court that it had not yet received authority to apply the Insurance Proceeds to the unpaid balance of the loan. The Thompsons received a discharge under § 1328(a) on March 15, 2018.  (Bankr. Dkt. 95).  On March 26, 2018, the Trustee filed the Chapter 13 Standing Trustee's Amended Final Report and Account (Bankr. Dkt. 97).

**Suggestion of Death**

Judy Thompson died on March 29, 2018. On April 30, 2018, Seterus filed the Suggestion of Death (the "Suggestion of Death") (Adv. Dkt. 27) in the Adversary. A copy of the obituary of Judy Thompson was attached to the Suggestion of Death as an exhibit. The obituary listed several surviving relatives of "Judith Lynn (Smith) Thompson," including her mother, one brother (Tommy Smith), one sister (Sandy Taylor), two nieces, one nephew, two great nephews, and one great niece.

According to the certificate of service, Seterus served a copy of the Suggestion of Death "either by electronic case filing or by United States mail postage pre-paid" to the following: Joe Thompson, counsel for the Thompsons, the Trustee, and the Office of the United States Trustee. (*Id.*). Seterus did not serve a copy of the Suggestion of Death on any of Judy Thompson's surviving relatives named in the obituary.

**Summary Judgment Motion & Motion to Dismiss**

On August 28, 2018, Joe Thompson filed the Summary Judgment Motion and Brief in Support of Summary Judgment Motion in the Adversary, alleging that there is no genuine issue in dispute and that he is entitled to summary judgment as a matter of law on Counts I and II asserted in the Complaint for breach of contract and violation of the automatic stay under 11 U.S.C. § 362.[9] Seterus filed the Motion to Dismiss earlier that same day, alleging that ninety days had elapsed since service of the Suggestion of Death, but no motion for substitution had been filed and, therefore, asking the Court to dismiss Judy Thompson's claims pursuant to Rule 7025 of the Federal Rules of Bankruptcy Procedure. On September 18, 2018, Joe Thompson filed the

---

[9] Hereinafter, all code sections refer to the U.S. Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

Response in Opposition to Motion to Dismiss, alleging that Seterus had failed to serve the Suggestion of Death on any non-parties.  Seterus then filed the Summary Judgment Response and the Brief in Opposition to Summary Judgment Motion on September 27, 2018.  Joe Thompson filed the Reply Brief on October 10, 2018, and Seterus filed the Reply to Response to Motion to Dismiss the same day.

## Discussion

At issue before the Court is whether Judy Thompson's claims against Seterus should be dismissed and whether Joe Thompson should be granted judgment as a matter of law on his claims against Seterus for breach of contract and willful violation of the automatic stay.  The Court considers first the Motion to Dismiss filed by Seterus.

### A.    Motion to Dismiss

Subject to certain provisions not relevant here, Rule 7025 of the Federal Rules of Bankruptcy Procedure incorporates by reference Rule 25 of the Federal Rules of Civil Procedure ("Rule 25").  Rule 25(a)(1) provides for the substitution of parties when a party to a lawsuit dies and the claim by or against the decedent is not extinguished.  Under Rule 25(a)(2), any motion to substitute must be served on the parties as provided in Rule 5 of the Federal Rules of Civil Procedure ("Rule 5") and on non-parties as provided in Rule 4 of the Federal Rules of Civil Procedure ("Rule 4").  The reference in Rule 25(a)(2) to Rule 5 is to Rule 7005 of the Federal Rules of Bankruptcy Procedure ("Rule 7005"), and the reference to Rule 4 is to Rule 7004 of the Federal Rules of Bankruptcy Procedure ("Rule 7004").  Rule 7005 applies Rule 5 in adversary proceedings without change.  Rule 7004 applies only specific subsections of Rule 4 in adversary proceedings and modifies some of its provisions by, *inter alia*, allowing service nationwide and by mail.  *Compare* FED. R. BANKR. P. 7004(b), *with* FED. R. CIV. P. 4(e).

There is no time limit for the substitution of the successor or representative of a deceased party other than the ninety days that is triggered under Rule 25 by proper service of a statement noting the death of a party. Under Rule 25, following proper service of "a statement noting the death" of a party, a motion for substitution must be made "by any party or by the decedent's successor or representative" within ninety days or the action by or against the decedent must be dismissed. FED. R. CIV. P. 25(a). The statement noting the death must be served in the same manner as the motion to substitute; it must be served on the parties as provided in Rule 5 and on non-parties as provided in Rule 4.

On April 30, 2018, Seterus filed the Suggestion of Death, noting the death of Judy Thompson. No successor or representative of Judy Thompson—neither Joe Thompson[10] nor any of her surviving relatives—filed a motion to substitute before expiration of the ninety days, and on August 28, 2018, Seterus filed the Motion to Dismiss requesting that the Court dismiss her claims pursuant to Rule 25(a).[11] Joe Thompson opposes the Motion to Dismiss, pointing out that Seterus failed to serve the Suggestion of Death on any non-party, including any of the individuals identified in Judy Thompson's obituary.

Although Rule 25(a) does not identify the "non-party" upon whom the statement noting the death must be served, most courts have construed Rule 25(a) as imposing a general obligation on the noticing party to serve notice upon a deceased party's successor or representative. *See Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*, No. 05-1307, 2011 WL 3207204,

---

[10] As stated previously, the Thompsons divorced in 2017. Although Joe Thompson testified that he and Judy Thompson remained friendly after the divorce, he was not involved in her financial affairs. (S. Ex. 5 at 6, 33).

[11] Seterus does not question whether Judy Thompson's claims in the Adversary survived her death.

at *2 (Bankr. D. Mass. July 26, 2011) ("While Fed. R. Civ. P. 25(a)(3) does not specifically identify what 'nonparties' must receive service, there is no question that the estate representative sought to be substituted for the decedent falls within that category else the Court would have no in personam jurisdiction over that nonparty."). Consistent with this majority view, the Fifth Circuit Court of Appeals Courts in *Sampson v. ASC Industries*, 780 F.3d 679 (5th Cir. 2015), held that a Rule 25 notice of death must be served on a deceased party's estate in accordance with Rule 4 before the ninety-day deadline can begin to run on the decedent's cause of action. *Id.* at 683. In reaching this conclusion, the Fifth Circuit was persuaded by the decisions of its sister circuits. *See Atkins v. City of Chicago*, 547 F.3d 869, 874 (7th Cir. 2008) ("[N]otice to the lawyers, service on the lawyers, knowledge of all concerned-nothing will suffice to start the 90-day clock running except service on whoever is identified as the decedent's representative or successor."); *Grandbouche v. Lovell*, 913 F.2d 835, 837 (10th Cir. 1990) ("[T]he service required by Rule 25(a)(1) on nonparties, specifically the successors or representatives of the deceased party's estate, must be serviced pursuant to FED. R. CIV. P. 4."); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 962 (4th Cir. 1985) ("Personal service of the suggestion of death alerts the nonparty to the consequences of death for a pending suit, signaling the need for action to preserve the claim if so desired.").

    In its Reply to the Response to Motion to Dismiss, Seterus cites *Keller v. Bennett*, 103 So. 3d 747, 751-52 (Miss. Ct. App. 2012), for the holding by the Mississippi Court of Appeals that Rule 25 of the Mississippi Rules of Civil Procedure ("Mississippi Rule 25"), which is nearly identical to its federal counterpart, does not require service on the deceased plaintiff's successor or representative in every case where death is suggested on the record but only sets forth the method for proper service on any non-party. (Adv. Dkt. 46 at 1-2). This narrow interpretation of

Mississippi Rule 25 led the Mississippi Court of Appeals in *Keller* to conclude that the statement of death must be served only on the party whose rights are being cut off by the ninety-day limit.

*Keller*'s interpretation of Mississippi Rule 25 is not binding on this Court, and the Court does not find its analysis persuasive. *See Ransom v. Brennan*, 437 F.2d 513, 520 (5th Cir. 1971) (noting that federal courts must apply federal rules). *Keller* represents a minority view, conflicts with the holding in *Sampson*, and was decided more than two years before *Sampson*. It is thus uncertain whether the Mississippi Court of Appeals would have reached the same result if it had had the benefit of the Fifth Circuit's reasoning in *Sampson*. *Keller*, however, cites with approval two decisions of the Fifth Circuit interpreting other provisions of Rule 25. *Keller*, 103 So. 3d at 751, 753 (citing *Ransom*, 437 F.2d at 519; *Ray v. Koester*, 85 F. App'x 983, 984 (5th Cir. 2004)).

Seterus attempts to distinguish *Sampson* on its facts because "[n]either the estate nor personal representatives of Judy Thompson have been identified." (Adv. Dkt. 46 at 2). In *Sampson*, counsel for the decedent, Lurlia A. Oglesby ("Oglesby"), filed the statement noting the death of her client, Rebecca Breaux ("Breaux"), the named plaintiff in the lawsuit. *Sampson*, 780 F.3d at 680. Oglesby served a copy of the death notice only on counsel for the defendant. After ninety days had passed without any motion to substitute being filed, the district court dismissed the lawsuit. Oglesby filed a motion to alter or amend the judgment of dismissal, arguing that the service requirements of Rule 25 were not met and, thus, the dismissal was premature. She then filed a separate motion to substitute Breaux's daughter and the executrix of Breaux's estate, Keva Nuckols Sampson ("Sampson"), as the named plaintiff in the lawsuit. The district court denied both motions, finding that Oglesby, as counsel for Sampson, was aware that the ninety-day period was running once Oglesby filed the suggestion of death and, therefore, Sampson had adequate notice and time to file a motion for substitution. *Id.* at 681. On appeal, the Fifth Circuit disagreed,

holding that the filing of the notice of death by Oglesby was not sufficient to trigger the ninety-day time limit given the absence of Rule 4 service on Sampson, the non-party representative of Breaux's estate. *Id.* at 682. "[I]nsistence on service even when the decedent's lawyer is the person making the suggestion makes a certain amount of sense; it protects the nonparty from finding [herself] in a situation in which a lawyer for someone else (the decedent) has thrust [her] into a case that [s]he would rather not be in, or at least not as the client of this lawyer." *Id.* (quoting *Atkins*, 547 F.3d at 874).

Finally, Seterus suggests that it would be unfair to read Rule 25 and *Sampson* as requiring a defendant who files a notice of death for a deceased plaintiff to bear the burden of identifying the decedent's successor or representative at the time the suggestion of death is made. (Adv. Dkt. 46 at 2). Most courts that have reached this issue, however, have found that where the defendant files a notice of death for a deceased plaintiff, the noticing defendant must at a minimum undertake a good faith effort to identify an appropriate representative. In *Fariss*, for example, the court did not find the requirement of service on the successor or representative to be an "onerous burden" and concluded that "it is generally appropriate to require the serving party to shoulder that burden, rather than permitting the absence of notice to decedent's representative to lead to forfeiture of the action." *Fariss*, 769 F.2d at 962. Moreover, in *Sampson*, the Fifth Circuit quoted *Fariss* for the proposition that "[s]ervice of the notice of death on the personal representative for a deceased-plaintiff's estate is generally required, *even where it is difficult to determine who the personal representative is.*" *Sampson*, 780 F.3d at 681 (emphasis added).

Notwithstanding Seterus's arguments to the contrary, the Court finds that *Sampson* is conclusive. Because Seterus did not serve the Suggestion of Death on Judy Thompson's successor or representative and failed to show that it made any effort to comply with that obligation, the

ninety-day period under Rule 25 never commenced. Accordingly, the Court finds that the Motion to Dismiss should be denied without prejudice. If Seterus identifies Judy Thompson's successor or representative and serves the Suggestion of Death on that non-party or, in the alternative, if Seterus is unable to identify a successor or representative but shows that it made good faith efforts to do so, the Court will entertain another motion to dismiss Judy Thompson's claims. At a minimum, good faith efforts would require Seterus to attempt to locate the adult surviving relatives listed in the obituary, including Sandy Taylor, who, according to Joe Thompson, was granted power of attorney over Judy Thompson before her death. (S. Ex. 5 at 11). Because Rule 7004 allows service nationwide and by mail, the burden on Seterus to serve the Suggestion of Death will be minimal.

The Court recognizes that the Adversary cannot continue indefinitely with Judy Thompson named as a plaintiff. At some point, the Court itself may take steps to determine whether substitution or dismissal is appropriate under the circumstances.

**B.      Summary Judgment Motion**

The Court next considers the Summary Judgment Motion filed by Joe Thompson. He contends that there is no genuine issue on the claims he alleged in Counts I and II of the Complaint that Seterus breached the Deed of Trust and willfully violated the automatic stay.

### 1.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), as made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly entered when the "depositions, documents,

electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is viewed as an important process through which parties can obtain a "just, speedy and inexpensive determination of every action." *Id.* at 327 (citations & quotation omitted).

The moving party bears the initial burden of proof to specify the basis upon which summary judgment should be granted and identify portions of the record that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1); *see also Celotex*, 477 U.S. at 322. Once the initial burden is met, the burden of production shifts to the nonmovant who then must come forward with specific facts, supported by the evidence in the record, upon which a reasonable factfinder could find a genuine fact issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]onclusory allegations" or "unsubstantiated assertions" do not meet the nonmovant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Summary judgment may be granted, after adequate time for discovery, against a nonmovant who "has failed to make a sufficient showing on an essential element of [the] case with respect to which [the party] has the burden of proof." *Celotex*, 477 U.S. at 323.

Even if the standards of Rule 56 have been met, the Court "has the discretion to deny motions for summary judgment and allow parties to proceed to trial so that the record might be more fully developed for the trier of fact." *Hall v. Desper (In re Desper)*, Adv. Proc. 09-05051-NPO, 2010 WL 653864, at *6 (Bankr. S.D. Miss. Feb. 19, 2010); *see also Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255); *River Region Med. Corp. v. Wright*, No. 3:13-cv-793-DPJ-FKB, slip op. at 4-6 (S.D. Miss. Aug. 5, 2014)

(affirming interlocutory order denying summary judgment); *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995); *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994); *Veillon v. Expl. Servs., Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989).

This Court previously has denied summary judgment to allow the parties to develop the facts at trial. *Good Hope Constr., Inc. v. RJB Fin., LLC (In re Grand Soleil-Natchez, LLC)*, No. 12-00013-NPO (Dkt. 437), at *33 (Bankr. S.D. Miss. Aug. 13, 2013). Here, too, the Court exercises its discretion to deny the Summary Judgment Motion. Judy Thompson is a named plaintiff, but her interests are not currently being represented in the Adversary. Joe Thompson's claims for breach of contract and willful violation of the stay arise, if at all, from the interactions between Judy Thompson, on the one hand, and Seterus and QBE, on the other hand, regarding the disposition of the Insurance Proceeds. Joe Thompson admitted he had no communications whatsoever with either Seterus or QBE about the Insurance Proceeds. Granting summary judgment in favor of Joe Thompson could adversely impact the interests of Judy Thompson's estate in pursuing these same claims and potentially recovering damages, a result the Court is unwilling to risk absent any effort being made to notify Judy Thompson's successor or representative of the Adversary and the estate being given an opportunity to participate in the litigation. *See, e.g.*, *Breaux v. ASC Indus.*, 298 F.R.D. 339, 341 (N.D. Tex. 2013) (staying all proceedings in the action after the filing of a notice of the plaintiff's death until a motion for substitution of parties as contemplated by Rule 25(a) could be filed), *overruled on other grounds by Sampson*, 780 F.3d at 683. The risk to Judy Thompson's estate is illustrated in the discussion below.

2.    **Breach of Contract**

In Count I of the Complaint, the Thompsons alleged that Seterus breached the Deed of Trust "by failing to timely apply the insurance or miscellaneous proceeds to the sums secured by the Security Instrument." (Adv. Dkt. 1-1 at 3). In the Summary Judgment Motion, Joe Thompson argues that he is entitled to judgment as a matter of law on his breach of contract claim.

To succeed on a breach of contract under Mississippi law, a plaintiff must prove the existence of a valid and binding contract and the breach of the contract by the defendant. *Smith v. Antler Insanity, LLC*, 58 F. Supp. 3d 716, 723 (S.D. Miss. 2014). No one disputes that the Deed of Trust constitutes a valid and binding contract between the Thompsons and Fannie Mae. *See Pepper v. Homesales, Inc.*, No. 1:08-cv-344, 2009 WL 544141-HSO-JMR, at *6 (S.D. Miss. Mar. 3, 2009) (noting that a deed of trust constitutes a written contract). The Thompsons, however, did not sue the lender, Fannie Mae; they sued Seterus, Fannie Mae's loan servicer.

Although Fannie Mae assigned certain duties under the Deed of Trust to Seterus related to the servicing of the loan, Seterus did not assume all of Fannie Mae's contractual obligations to the Thompsons. *MidSouth Rail Corp. v. Citizens Bank & Tr. Co.*, 697 So. 2d 451, 455 (Miss. 1997) (holding that the assignee of a contract does not incur obligations of the assignor absent an express agreement). For example, Ludlow testified that Seterus was required to follow extensive servicing guidelines prepared by Fannie Mae with respect to the application and disbursement of insurance proceeds. Her undisputed testimony showed that Fannie Mae did not delegate to Seterus the decision whether to apply the Insurance Proceeds. Rather, Seterus's role in the decision-making process was limited to preparing and submitting "Form 176" to Fannie Mae on which a decision could be made. Joe Thompson does not allege that Seterus failed to submit "Form 176" in a timely

manner or that "Form 176" contained inadequate or misleading information.  Yet the Thompsons sued Seterus, not Fannie Mae.

Assuming Seterus owed contractual obligations to the Thompsons regarding the decision whether to apply the Insurance Proceeds to the unpaid loan balance, Joe Thompson contends that Seterus was required to do so in September 2015 when Judy Thompson first made the request. Section 5 of the Deed of Trust, however, expressly authorized Fannie Mae to use the Insurance Proceeds to restore or repair the damage to the Property rather than to credit the Insurance Proceeds against the debt unless the restoration or repair of the Property would be economically infeasible, or its security would be lessened.  (J.T. Ex. 1 at 8).  The summary judgment evidence does not disclose the precise reason why Fannie Mae declined Judy Thompson's request on December 2, 2015, to apply the Insurance Proceeds to the unpaid loan balance, but the Thompsons did not allege in the Complaint that repairing the woodshop was economically infeasible.

In *Dabney v. Countrywide Home Loans, Inc.*, 428 F. App'x 474, 476 (5th Cir. 2011), the Fifth Circuit rejected a breach of contract claim regarding a similar broad grant of authority to the lender with respect to the disbursement of insurance proceeds.  There, the borrower argued that a mortgage lender was required to disburse all insurance proceeds once repairs were deemed economically feasible.  The Fifth Circuit noted that the contract authorized the lender to "disburse proceeds for the repairs and restoration . . . in a series of progress payments as the work is completed."  *Id.*  The contract also granted the lender the authority to "withhold the 'insurance proceeds until' [the lender] had been afforded 'an opportunity to inspect . . . to ensure that the work has been completed.'"  *Id.*  Reasoning that the lender's inspection revealed that the plaintiff had only completed fifteen percent of the repairs, even though thirty-three percent of the funds had

been disbursed, the Fifth Circuit concluded that the lender was fully justified in refusing to disburse additional proceeds.  *Id.*

Like the provision in *Dabney*, the Deed of Trust granted Fannie Mae broad authority over the use of the Insurance Proceeds.  Moreover, Seterus has shown through Ludlow's testimony that the thirty-two-month delay in crediting the Insurance Proceeds may have been attributable to Judy Thompson's conflicting instructions and her failure to provide requested documents to Seterus in a timely manner.

Finally, Joe Thompson contends that credit from the Insurance Proceeds would have cured their default in mortgage payments and lowered the Plan payments.  The Deed of Trust, however, did not require Fannie Mae to apply the Insurance Proceeds against the debt.  Section 2 provides that "[a]ny application of . . .  insurance proceeds . . . to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments."  (J.T. Ex. 1 at 5).

As reflected in the above discussion, issues exist common to the claims of both Judy Thompson and Joe Thompson as to whether Seterus owed them contractual duties regarding the disposition of the Insurance Proceeds and, if so, whether Seterus breached those duties.  The Court finds that the Summary Judgment Motion on the breach of contract claim asserted in Count I should be denied to allow a fuller record to be developed at trial and an opportunity for Judy Thompson's estate to participate in the litigation.

### 3.    Willful Violation of the Automatic Stay

In Count II of the Complaint, the Thompsons alleged that Seterus willfully violated the automatic stay "by exercising control over the insurance proceeds."  (Adv. Dkt. 1-1 at 3).  Joe

Thompson argues that he is entitled to judgment as a matter of law that Seterus exercised control over the Insurance Proceeds for thirty-two months in violation of § 362(a)(3).

"When a bankruptcy petition is filed, an automatic stay operates as a self-executing injunction" that prevents creditors from engaging in "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354-55 (5th Cir. 2008); 11 U.S.C. § 362(a)(3). A leading treatise on bankruptcy law asserts that the automatic stay under § 362(a)(3) is violated whenever there is a violation of § 542.

> This provision [§ 362(a)(3)] should be read with sections 542 and 543, which assist the trustee in obtaining possession of property of the estate that is in the possession of third parties, by requiring turnover of the property to the trustee. The failure of an entity in possession of estate property to turn over the property to the trustee would be a violation of section 362(a)(3) except as may otherwise be provided in section 542.

3 COLLIER ON BANKRUPTCY ¶ 362.03[5] (16th ed. 2018).

The purpose behind the automatic stay in § 362(a) is to allow a debtor "breathing room" and a chance for a fresh start. *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 301 (5th Cir. 2005) (quotation omitted). Should the automatic stay be violated, Congress has provided a debtor with a private right of action for any "willful violation." *Campbell*, 545 F.3d at 355. Section 362(k) provides, in pertinent part: "[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

Specific intent to violate the automatic stay is not required to prove the willfulness of a creditor's violation. *Campbell*, 545 F.3d at 355. Instead, the Fifth Circuit has formulated a three-part test for establishing an actionable violation of the stay under § 362(k): (1) the creditor must have known of the existence of the stay, (2) the creditor's acts must have been intentional, and (3)

the creditor's acts must have violated the stay. *Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008).

The Court finds that an issue exists as to whether the automatic stay protected the Insurance Proceeds with respect to Joe Thompson's bankruptcy estate, or, more simply stated, whether Joe Thompson's estate held an arguable interest in the Insurance Proceeds. *Brown*, 422 F.3d at 304 (holding that automatic stay applies to all property "arguably" owned by the debtor, even if it is later determined that the debtor did not own the property).

Although the Thompsons filed a joint petition for bankruptcy relief under § 302(a), the filing of their joint petition created two separate bankruptcy estates, not one.[12]  2 COLLIER ON BANKRUPTCY ¶ 302.02[1][b] (16th ed. 2018) (joint administration simply means that their estates are combined for purely administrative functions).  As separate estates, each one consists of its own property separately protected by the automatic stay.  *See* COLLIER FAMILY LAW AND THE BANKRUPTCY CODE ¶ 1.03[5] (2018).

The content of Joe Thompson's separate estate is determined under § 541.  The filing of a bankruptcy petition creates an estate consisting of all legal or equitable interests of the debtor in property as of the petition date.  11 U.S.C. § 541(a).  In addition to the property specified under § 541(a), property of the estate in chapter 13 cases also includes:

> [A]ll property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first[.]

---

[12] Under § 302(b), joint debtors may ask the Court after the commencement of their joint case to determine the extent, if any, to which the debtors' estates should be consolidated, the effect of which is to combine the assets and liabilities of the two estates into a single pool to pay creditors. 2 COLLIER ON BANKRUPTCY ¶ 302.06 (16th ed. 2018).  The Thompsons never filed a motion to consolidate, and no formal order was entered in the Bankruptcy Case substantively consolidating their bankruptcy estates.

11 U.S.C. § 1306(a)(1).  With respect to insurance proceeds in general, the debtor's ownership of the insurance policy is relevant but not necessarily determinative as to whether the estate owns the proceeds from that policy.  *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55 (5th Cir. 1993).  Casualty insurance proceeds from the destruction of property belonging to a chapter 13 debtor's estate, however, generally have been held to constitute property of the estate.  *Bartholow v. Calder (In re Calder)*, 171 B.R. 36 (Bankr. N.D. Tex. 1994).  Moreover, § 541(a)(6) includes as property of the estate "[p]roceeds, product, offspring, rents, or profits of or from property of the estate."  11 U.S.C. § 541(a)(6).  Proceeds is "intended to be a broad term to encompass all proceeds of property of the estate."  *Bradt v. Woodlawn Auto Workers, F.C.U.*, 757 F.2d 512, 515 (2d Cir. 1985) (finding that insurance payment for repairs to an automobile that is property of the estate unquestionably is also property of the estate) (quotations & citation omitted).

The insurance policy issued by State Farm is not part of the summary judgment record, but according to Joe Thompson, Judy Thompson alone owned the policy and, thus, the casualty Insurance Proceeds constituted property of her chapter 13 bankruptcy estate.[13]  It is unclear, however, whether the Insurance Proceeds constituted property of Joe Thompson's chapter 13 bankruptcy estate.  Joe Thompson is not a named insured, his name does not appear on the title to the Property, and he testified that he never has held any financial interest in the Property or the woodshop.[14]  "The [wood]shop didn't belong to me.  The house didn't belong to me.  All that was

---

[13] In chapter 13 cases, confirmation of a debtor's plan vests all property back to the debtor unless the plan or order confirming the plan otherwise provides.  11 U.S.C. § 1327(b).  Here, the Confirmation Order provided otherwise: "All property shall remain property of the estate and shall vest in the debtor only upon dismissal, discharge, or conversion."  (Bankr. Dkt. 21).

[14] Joe Thompson testified in his deposition that he stored some personal property in the woodshop that was destroyed by the fire, but there is no evidence in the record that any portion of the Insurance Proceeds paid for damages to any property other than to the woodshop itself.  (S. Ex. 5 at 30-31).

Judy's."  (S. Ex. 5 at 43).   Joe Thompson was Judy Thompson's second husband, and Judy

Thompson bought the Property from her parents before their marriage.  (S. Ex. 5 at 14, 29, 33).

Consistent with Joe Thompson's own view that he held no interest in the Property, he did not assist

Judy Thompson in making an insurance claim after the loss of the woodshop and never spoke with

any representative of Seterus about the disposition of the Insurance Proceeds.  (S. Ex. 5 at 28).

Notwithstanding Joe Thompson's testimony, the parties appear to assume that the

Insurance Proceeds constitute marital property in which Joe Thompson's estate held an arguable

interest.  Yet Mississippi is not a community property state.  *Davis v. Davis*, 626 So. 2d 111 (Miss.

1995).  Marital property under Mississippi law consists only of assets acquired or accumulated

during the marriage.  *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994).  An issue thus exists

as to whether Joe Thompson's estate (as opposed to Judy Thompson's estate) held an arguable

interest in the Insurance Proceeds warranting the protection afforded by the automatic stay.  The

presence of this issue supports the Court's decision to deny the Summary Judgment Motion

pending an effort to notify Judy Thompson's successor or representative about the Adversary.

In defense of the allegation that Seterus exercised control over the Insurance Proceeds in

willful violation of the automatic stay, Seterus posits that no stay violation occurred because of the

conflicting instructions given by Judy Thompson and her general lack of cooperation and because

of the absence of any direction from the Trustee as to the disposition of the Insurance Proceeds.

(Adv. Dkt. 44 at 6).  This argument suggests an intent by Seterus to rely on *Citizens Bank of

Maryland v. Strumpf*, 516 U.S. 16 (1995), in which the U.S. Supreme Court held that a bank's

administrative freeze of a debtor's checking account before filing a motion for relief to exercise

its right of offset was not a violation of the automatic stay.

Respondent's reliance on these provisions [§ 362(a)(3) and (a)(6)] rests on the false
premise that petitioner's administrative hold took something from respondent, or

> exercised dominion over property that belonged to respondent. That view of things
> might be arguable if a bank account consisted of money belonging to the depositor
> and held by the bank. In fact, however, it consists of nothing more or less than a
> promise to pay, from the bank to the depositor, . . . and petitioner's temporary
> refusal to pay was neither a taking of possession of respondent's property nor an
> exercising of control over it, but merely a refusal to perform its promise.

*Strumpf*, 516 U.S. at 21. Seterus's reliance on *Strumpf* would require resolution of issues regarding the conduct of Seterus, QBE, and Judy Thompson and the role of the Trustee apart from the question whether the Insurance Proceeds constituted property of Joe Thompson's estate. As with the breach of contract claim, the Court finds that the Summary Judgment Motion on the stay violation claim asserted in Count II should be denied given that Judy Thompson's successor or representative, if any, is likely unaware of the pending Adversary.

## Conclusion

Because Seterus did not serve the Suggestion of Death on Judy Thompson's successor or representative and failed to show that it made any effort to comply with that obligation, the ninety-day period to file a motion to substitute under Rule 25 has not yet commenced, and the Motion to Dismiss should be denied without prejudice. Because Joe Thompson asks the Court to resolve issues—such as whether the Insurance Proceeds constituted property of his bankruptcy estate, whether Seterus owed him contractual obligations regarding the disbursement of the Insurance Proceeds, and whether the Insurance Proceeds were misapplied in breach of the Deed of Trust— that could adversely impact the interests of Judy Thompson's estate in pursuing and potentially recovering damages on the same claims he asserts in the Adversary, the Court finds that the Summary Judgment Motion should be denied given that no effort yet has been made to notify Judy Thompson's successor or representative of the Adversary. "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial,'" so that the record might be more fully developed at

trial.  *Firman*, 684 F.3d at 538; *River Region Med. Corp.*, No. 3:13-cv-793-DPJ-FKB, slip op. at 4-6; *see also Kunin*, 69 F.3d at 62; *Black*, 22 F.3d at 572; *Veillon*, 876 F.2d at 1200.

IT IS, THEREFORE, ORDERED that the Motion to Dismiss is denied without prejudice.

IT IS FURTHER ORDERED that the Summary Judgment Motion is hereby denied.

##END OF OPINION##